**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| CHRISTOPHER COLBERT, *et ano.*, | ) | |
| | ) | |
| Plaintiffs, | ) | Case No. 13-cv-2397 |
| | ) | |
| v. | ) | Judge Robert M. Dow, Jr. |
| | ) | |
| RUSSELL WILLINGHAM, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |

**MEMORANDUM OPINION AND ORDER**

Before the Court are the IDOC Defendants' motion for summary judgment [65], the City of Chicago Defendants' motion for summary judgment [71], and Plaintiffs' motion for partial summary judgment [77]. For the reasons set forth below, the Court grants Defendants' motions [65, 71] and denies Plaintiffs' motion [77].

**I.      Background**

The Court takes the relevant facts from the parties' Local Rule 56.1 statements, construing the facts in the light most favorable to the nonmoving party.[1] Here, the identity of the nonmoving party depends on whose motion the Court is considering.

**A.      Undisputed Facts**

In March 2011, Plaintiff Jai Crutcher was released from prison and put on Mandatory Supervised Release (*i.e.*, parole). While on parole, Mr. Crutcher—outfitted with an electronic tracking device—stayed at the home (or, more accurately, in the basement) of Plaintiff

---

[1] Local Rule 56.1 requires a party moving for summary judgment to submit a statement of material facts as to which the movant contends there is no genuine issue and entitles the movant to judgment as a matter of law. The rule permits a movant to file up to 80 separately-numbered statements of undisputed facts. L.R. 56.1(a)(3). The rule also requires the nonmovant to file a concise response to the movant's statement of facts setting forth "any disagreement, specific references to the affidavits, parts of the record, and other supporting materials." L.R. 56.1(b)(3)(A).

Christopher Colbert, who lived in the West Englewood neighborhood on Chicago's south side. As part of his supervised release, Mr. Crutcher was required to "consent to a search of [his] person, property, or residence." Mr. Crutcher also agreed that he "w[ould] not use or knowingly have under [his] control or in [his] residence any firearms, ammunition, or explosive devices."

Shortly after Mr. Crutcher was released on parole, Defendant Officer Willingham—a Chicago Police Officer—received information from a cooperating individual who claimed to have seen Mr. Crutcher in Mr. Colbert's West Englewood home (*i.e.*, Mr. Crutcher's then-current residence) with two firearms: a 12-gauge shotgun and a 40-caliber handgun.[2] Officer Willingham ran a name check on Mr. Crutcher, which revealed that he was on parole for the use of a firearm. Based on this information, Officer Willingham contacted Parole Officer Jack Tweedle, and the two decided to conduct a parole check of Mr. Crutcher's residence to ensure that he was in compliance with the terms of his supervised release.

At 6:30 a.m. on March 31, 2011—less than one month after Mr. Crutcher was released from prison—no fewer than 10 agents (some police officers, some parole officers) arrived at Mr. Colbert's home to conduct a compliance check (*i.e.*, to determine whether Mr. Crutcher was in compliance with the terms of his supervised release). Among this group were the four individually named Defendants, including Officer Willingham and three agents employed by the Illinois Department of Corrections ("IDOC"): Jack Tweedle, Louis Hopkins, and Darryl Johnson. Mr. Crutcher was asleep in the basement when he heard a knock at the door. Mr. Crutcher looked outside and saw a number of police officers outside of the house. He did not open the door immediately; rather, it took several minutes for Mr. Crutcher to let the officers in.

---

[2] The parties dispute the reliability of the cooperating individual. Defendants refer to the individual as a "confidential informant" who has provided the police with reliable information in the past. However, at his deposition, Officer Willingham provided very little information regarding this informant (despite extensive questioning), verifying only one prior instance where this individual provided him with reliable information.

The officers informed Mr. Crutcher that they were there to conduct a parole check on his residence, and Mr. Crutcher consented to the search of his residence per the terms of his supervised release.

The officers placed Mr. Crutcher in handcuffs while they conducted the search. At some point during the search, Plaintiff Mr. Colbert arrived home (Mr. Crutcher had called him at some point after the police arrived). The agents informed Mr. Colbert that they were conducting a search of the premises, and they put Mr. Colbert in handcuffs while they continued their search.

Mr. Colbert alleges that the officers caused damage to his home during the search. Specifically, he claims that in the basement, "[t]he officers pulled out insulation, put holes in the walls, ripped the couch open to search its contents, and tracked dog feces throughout the house." [74, ¶ 13.] In the kitchen on the main floor, the officers allegedly broke part of the kitchen countertop and also broke hinges off of certain shelves (in a way that suggested that the officers had put their weight on the shelves for support). [73, at 6.] Mr. Colbert did not provide any evidence of the pre-search condition of his home (absent his own testimony), and he is "unable to provide any description of any of the officers who allegedly damaged his property." [73, at 7.]

During the search, the officers encountered a locked bedroom on the main floor. Mr. Colbert told the officers that the bedroom belonged to him and his wife. There is a factual dispute as to how the police obtained the key to this locked bedroom (Defendants say that Mr. Colbert surrendered the key willingly; Mr. Colbert says that the officers wrestled him to the floor and took it), but once inside, they found a 12-gauge shotgun in the closet along with approximately 100 rounds of ammunition. The police also found a box for a 40-caliber semi-automatic handgun, although they did not recover the handgun itself. Mr. Colbert admitted ownership of both firearms. The shotgun was not registered with the City of Chicago.

After finding the firearm and ammunition, the officers formally arrested both Plaintiffs. The officers arrested Mr. Crutcher for Unlawful Use of a Weapon/Felon in Possession of a Firearm, pursuant to 720 ILCS 5.0/24–1.1(a), and Violation of Parole, pursuant to 730 ILCS 5.0/3–3–9. Officer Willingham submitted a criminal complaint against Mr. Crutcher, but that prosecution ended on April 19, 2011 when a Cook County judge dismissed the case on a finding of no probable cause (Cir. Ct. of Cook Cnty., Case No. 11111538901). [70-10.] The following month a grand jury indicted Mr. Crutcher on one count of being an armed habitual criminal and two counts of unlawful possession of a firearm by a felon (Cir. Ct. of Cook Cnty., Case No. 11-CR-690101). That prosecution ended on February 28, 2012 pursuant to a finding of not guilty. [70-12.] In addition to these two criminal prosecutions, Mr. Crutcher also had a parole revocation hearing based on a Parole Violation Report filed by Defendant Officer Hopkins, who cited Mr. Crutcher for having violated his parole when he was arrested for possessing a firearm. The Parole Board ultimately released Mr. Crutcher from IDOC custody (after approximately 1.5 months), and Mr. Crutcher returned to the Cook County Jail pending resolution of his then-pending criminal charges.

Regarding Mr. Colbert, Officer Willingham testified that he arrested Mr. Colbert for failing to register his firearm pursuant to § 8-20-140 of Chicago's Municipal Code, as well as an accompanying state-law charge for possessing a shotgun able to hold over three rounds pursuant to 520 ILCS 5/2.33(m). [See 94-1, at 1; 70-5, at 5.] However, due to what Officer Willingham calls a "scrivener's error," instead of charging Mr. Colbert under § 8-20-140, the official charge was for a violation of § 8-20-040, which made it illegal to possess more than one assembled and operable firearm in a home at any given time. Mr. Colbert was released from custody on the same day of his arrest, and the criminal case against Mr. Colbert was later dismissed. [73, at 9.]

### B.	Plaintiffs' Complaint

Plaintiffs' second amended complaint [45], brought pursuant to 42 U.S.C. § 1983, is composed of 15 numbered paragraphs without any enumerated counts. Defendants filed their respective motions for summary judgment [65, 71] based on their interpretation of the claims as presented in the operable complaint. In responding to Defendants' motions, Plaintiffs accused Defendants of overlooking certain claims in their complaint while pressing other claims that Plaintiffs had no intention of advancing, and faulted Defendants for not serving contention interrogatories to iron out the claims at issue before moving for summary judgment. Plaintiffs also moved for summary judgment [77] on two of their claims: the purported false arrest of both Plaintiff Crutcher and Plaintiff Colbert.

The Court will first address all claims involving Mr. Crutcher, followed by the claims involving Mr. Colbert, distinguishing between those claims that Plaintiffs raised in their operable complaint and those that Plaintiffs raised for the first time in their summary judgment briefing.

## II.	Legal Standard

Summary judgment is proper where "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); see also *Sallenger v. City of Springfield, Ill.*, 630 F. 3d 499, 503 (7th Cir. 2010) (citing Fed. R. Civ. P. 56(c)(2) and noting that summary judgment should be granted "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law"). In determining whether summary judgment is appropriate, the court should construe all facts and reasonable inferences in the light most favorable to the non-moving party. See *Carter v. City of Milwaukee*, 743 F. 3d 540, 543 (7th Cir. 2014). Rule 56(a) "mandates the entry of summary judgment, after

adequate time for discovery and upon motion, against any party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party would bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986)). Put another way, the moving party may meet its burden by pointing out to the court that "there is an absence of evidence to support the nonmoving party's case." *Id.* at 325.

To avoid summary judgment, the opposing party then must go beyond the pleadings and "set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986) (internal quotation marks and citation omitted). For this reason, the Seventh Circuit has called summary judgment the "put up or shut up" moment in a lawsuit—"when a party must show what evidence it has that would convince a trier of fact to accept its version of events." See *Koszola v. Bd. of Educ. of City of Chi.*, 385 F. 3d 1104, 1111 (7th Cir. 2004). In other words, the "mere existence of a scintilla of evidence in support of the [non-movant's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [non-movant]." *Anderson*, 477 U.S. at 252.

III. **Analysis**

    A.     **Claims by Plaintiff Crutcher**

In Plaintiffs' second amended complaint, Plaintiff Crutcher alleges (1) a false arrest claim against all individual defendants and (2) a malicious prosecution claim against Defendant Willingham. By comparison, in Plaintiffs' opposition to summary judgment, Plaintiff Crutcher alleges (1) false arrest against Defendant Willingham only,[3] (2) malicious prosecution against Defendants Willingham *and the City of Chicago*, and one entirely new claim: (3) improper issuance of a parole warrant against Defendant Hopkins.

---

[3] Plaintiff Crutcher concedes that the three IDOC Defendants (Messrs. Tweedle, Johnson, and Hopkins) did not arrest him, and that he is not pursuing this claim against those individuals. [75, at 3–4.]

### 1. False Arrest

Plaintiff Crutcher alleges that Defendant Officer Willingham lacked reasonable suspicion to arrest him. All parties (both Plaintiffs and Defendants) have moved for summary judgment on this issue. To be clear, this is the only claim on which Plaintiff Crutcher has moved for summary judgment.

The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. Under normal circumstances, "a warrantless arrest by a law officer is reasonable under the Fourth Amendment where there is *probable cause* to believe that a criminal offense has been or is being committed." *Devenpeck v. Alford*, 543 U.S. 146, 152 (2004) (emphasis added). However, that standard is different for parolees (who have a more limited liberty interest than other citizens, see *Morrissey v. Brewer*, 408 U.S. 471, 480 (1972)), wherein a warrantless search or seizure can occur where the officer has *reasonable suspicion* of criminal activity. *Knox v. Smith*, 342 F.3d 651, 657 (7th Cir. 2007) (citing *United States v. Knights*, 534 U.S. 112, 121 (2001)). The reasonable suspicion standard requires "'something less than probable cause but more than a hunch,' which exists when there is some 'objective manifestation' that a person is, or is about to be, engaged in prohibited activity." *Id.* at 659 (quoting *United States v. Lenoir*, 318 F.3d 725, 729 (7th Cir. 2003)). Reasonable suspicion is "a fact-specific inquiry that looks at the totality of the circumstances in light of common sense and practicality." *United States v. Richmond*, 641 F.3d 260, 262 (7th Cir. 2011); see also *Gibbs v. Lomas*, 755 F.3d 529, 537 (7th Cir. 2014) (noting that probable cause to arrest is also a totality-of-the-circumstances inquiry). "[P]robable cause (and, by analogy, reasonable suspicion) is normally a mixed question of law

and fact, but where * * * one side concedes the other's facts as to what happened, it is a question of law." *Id.* at 657 (citing *Smith v. Lamz*, 321 F.3d 680, 684 (7th Cir. 2003)).

The relevant inquiry is whether, under the totality of the circumstances, Officer Willingham had reasonable suspicion that Mr. Crutcher had committed or was committing either of the two crimes for which Mr. Crutcher was arrested (or any other crime, for that matter). See *Devenpeck*, 543 U.S. at 153–56 (explaining that an arrest is reasonable under the Fourth Amendment as long as the arresting officer has probable cause to believe that *some* criminal offense has been or is being committed, even if that crime is not reflected in the arrestee's initial charge). The elements of an Unlawful Use of a Weapon by a Felon claim are "(1) the knowing possession or use of a firearm and (2) a prior felony conviction." *People v. Gonzales*, 600 N.E.2d 1189, 1192–93 (Ill. 1992). For the parole-violation arrest, Officer Willingham needed reasonable suspicion that Mr. Crutcher knowingly had a firearm or ammunition in his residence; possession of the firearm (actual or constructive) is not required. Because the parole-violation claim arguably has a lower bar for arrest (*i.e.*, a reasonable suspicion that Mr. Crutcher knowingly *resided* in a home with a firearm, versus a reasonable suspicion that he knowingly *possessed* a firearm), the Court will begin there.

Plaintiff Crutcher argues that there was insufficient evidence to give rise to a reasonable suspicion that he knowingly resided in a home with a firearm. In support of his argument, Mr. Crutcher notes that he lived in Mr. Colbert's basement, and that the shotgun was found in Mr. Colbert's locked bedroom (which is in the upstairs living area). In other words, Mr. Crutcher argues that there were two separate residences within the home (the "basement" residence and the "upstairs" residence), and that the terms of his parole are not affected by the firearm-owning predilections of his "upstairs" neighbors. Defendant Willingham argues that Plaintiffs jointly

occupied the building, and that therefore Mr. Colbert's bedroom could be considered part of Mr. Crutcher's residence for purposes of interpreting Mr. Crutcher's compliance with the terms of his supervised release.

The Court is not aware of any cases interpreting the scope of the term "residence" as used in a supervisory release agreement, leaving somewhat of a "gray area" regarding whether a parolee's firearm restrictions extend throughout, or only to certain portions of, a shared residence. But it would seem contrary to the point of the provision (and would create a dangerous loophole) to allow a parolee to knowingly reside in a home with multiple firearms, so long as the firearms are located in other occupants' bedrooms. While a non-parolee co-tenant arguably maintains a privacy interest in in areas subject to his or her exclusive control,[4] whatever privacy interest Mr. Colbert had in his own bedroom does not impact whether Mr. Crutcher resided in a home with a firearm.[5]

That being said, the fact that the officers found the shotgun in Mr. Colbert's locked bedroom does impact the analysis of whether Mr. Crutcher *knowingly* resided in a home with a firearm. Defendant Willingham argues that his reasonable suspicion as to the "knowledge" element of the crime was derived from (a) the several-minute delay that occurred before Mr. Crutcher let the officers into his residence (*i.e.*, time during which Mr. Crutcher may have hid the firearm in Mr. Colbert's bedroom), and (b) information provided by a cooperating

---

[4] See, *e.g.*, *State v. Norman*, 21 N.E.3d 1153, 1165–66 (Ohio Ct. App. 2014); *People v. Woods*, 981 P.2d 1019 (Cal. 1999); *State v. Johnson*, 748 P.2d 1069 (Utah 1987).

[5] Even if the officers' warrantless search of Mr. Colbert's bedroom were constitutionally improper, Mr. Crutcher cannot benefit from an invasion of Mr. Colbert's Fourth Amendment rights. See, *e.g.*, *United States v. Salvucci*, 448 U.S. 83, 87 (1980) (holding that "only defendants whose Fourth Amendment rights have been violated [can] benefit from the [exclusionary] rule's protections" (quoting *Rakas v. Illinois*, 439 U.S. 128, 134 (1978))). Regardless, while in the criminal context the "fruit of the poisonous tree" doctrine might render the firearm-related arrests tainted by the possible constitutional infirmity of the search that uncovered the shotgun, this doctrine does not extend to civil cases for false arrest. See *Dyson v. Vill. of Midlothian*, 2015 WL 778850, at *7 n.7 (N.D. Ill. Feb. 18, 2015).

individual regarding Mr. Crutcher's possession of a shotgun matching the description of what the officers found in Mr. Crutcher's residence.

As to the former point, while Mr. Crutcher's delay in answering the door does not imply any specific wrongdoing, such a delay can arouse a suspicion of criminal activity that can be relevant in a totality-of-the-circumstances inquiry. See, *e.g.*, *United States v. Yuknavich*, 419 F.3d 1302, 1311 (11th Cir. 2005) (holding that a parolee's delay in answering the door contributed to a reasonable suspicion of wrongdoing); *United States v. Charleston*, 2014 WL 1329419, at *12 (E.D. Wis. Apr. 1, 2014) ("The significant delay between the time [the officers] began knocking and when Charleston finally opened the door would have only increased their suspicion."). But see *United States v. Crapser*, 472 F.3d 1141, 1156 (9th Cir. 2007) (finding that a two-minute delay was an "immaterial fact" that did not contribute to a finding of reasonable suspicion of drug activity where the legitimate purpose of the stop was unrelated to drug activity). The delay is relevant here, and thus a contributing factor to Officer Willingham's articulation of reasonable suspicion, because of its duration (4 minutes according to Mr. Crutcher, and 15–20 minutes, according to the officers), because Officer Willingham knew that Mr. Crutcher was on parole for the use of a firearm, because Officer Willingham received a tip that Mr. Crutcher had been seen with firearms in his residence while on parole, and because the purpose of the investigation was to search the home for firearms.

Regarding Officer Willingham's informant (or "cooperating individual"), information from a reliable confidential informant can justify reasonable suspicion of criminal activity. See, *e.g.*, *United States v. Hagenow*, 423 F.3d 638, 642 (7th Cir. 2005) (finding reasonable suspicion where officers relied on a "confidential informant who had provided reliable information to law enforcement officials in the past"), *United States v. Jones*, 341 F. App'x 176, 178 (7th Cir. 2009)

(same). But here there is a dispute over whether the informant in question was reliable. Plaintiff Crutcher's objection stems from the fact that Officer Willingham failed to provide any details about the purported reliability of the informant, despite fervent questioning by Plaintiff's counsel. Officer Willingham's only basis for his contention that his source was reliable was his alleged history of receiving reliable information from this informant, although Officer Willingham could not recall how many prior occasions the informant provided him with reliable information, or even whether there was more than one such occasion. Thus, viewing these facts in the light most favorable to Plaintiff Crutcher, the cooperating individual here is more akin to an anonymous tipster (*i.e.*, a person with no inherent indicia of reliability). And in general, anonymous tips are insufficient to provide reasonable suspicion. See *Florida v. J.L.*, 529 U.S. 266, 270 (2000).

That being said, "there are situations in which an anonymous tip, suitably corroborated, exhibits 'sufficient indicia of reliability to provide reasonable suspicion." *Id.* (quoting *Alabama v. White*, 496 U.S. 325, 329 (1990)). And here, Officer Willingham happened upon the acme of all corroborating evidence: the shotgun itself. Because Mr. Crutcher was not arrested until after Defendants found the shotgun in his residence, all evidence leading up to the arrest contributes to Officer Willingham's reasonable suspicion of criminal activity. In other words, as the Seventh Circuit has said, "[w]e need not address whether the police would have had a reasonable suspicion had they acted solely on the basis of the uncorroborated tip of a [purportedly] previously reliable informant because such is not the case here." *United States v. Ocampo*, 890 F.2d 1363, 1368 (7th Cir. 1989). Instead, "[t]he information supplied by the informant was just one factor among many supporting a reasonable and articulable suspicion that [Mr. Crutcher] was engaged in criminal activity," including the discovery of corroborating evidence. *Id.*

Finally, Mr. Crutcher argues that, technically speaking, his arrest occurred when Defendants entered the home and handcuffed him, which occurred before Defendants found the shotgun. See *Henry v. United States*, 361 U.S. 98, 103 (1959) ("When the officers interrupted the two men and restricted their liberty of movement, the arrest, for purposes of this case, was complete.") Thus, Mr. Crutcher argues that his delay in answering the door plus the unreliable information from the tipster—absent evidence of the shotgun itself—was insufficient to create a reasonable suspicion of criminal activity. But the Court need not resolve this issue, because the Court concludes that Defendants' handcuffing of Mr. Crutcher was not an arrest. See *Michigan v. Summers*, 452 U.S. 692, 702–03 (1981) (listing justifications for temporarily detaining an occupant of premises being searched—including flight risk, officer safety, and the facilitation of the orderly completion of the search—and explaining that such detentions do not qualify as arrests); *United States v. Wilson*, 2 F.3d 226, 232 (7th Cir. 1993) (using handcuffs for a short duration under "potentially dangerous" conditions while the officer "was actively pursuing the investigation" was not an arrest); *Watson v. Cieslak*, 2011 WL 446276, at *4 (S.D.N.Y. Jan. 5, 2011) ("[T]he use of handcuffs in itself has repeatedly been held to not constitute an arrest * * *."); *United States v. Bailey*, 468 F. Supp. 2d 373, 384–85 (E.D.N.Y. 2006) (holding that handcuffing a suspect was warranted where detectives were searching for a firearm at suspect's residence). Here, Defendants were justified in handcuffing Mr. Crutcher upon entering the home to both minimize the risk of harm to officers (who were investigating a potential firearm offense from a prior firearm offender) and to facilitate the orderly completion of the search, and thus the handcuffing alone did not constitute an arrest.

The Court concludes that, under the totality of the circumstances, Officer Willingham had reasonable suspicion to believe that Mr. Crutcher was violating his parole by knowingly residing

in a home with a firearm. Officer Willingham relied on multiple factors in formulating his reasonable suspicion, including (1) knowledge that Mr. Crutcher was on parole for the use of a firearm, (2) information from an informant (considered an anonymous tipster for purposes of this opinion) that the informant saw Mr. Crutcher in his residence with multiple firearms, including a shotgun, (3) the amount of time it took Mr. Crutcher to answer the door when the Officers arrived to conduct his parole check, and (4) the discovery of corroborating evidence (*i.e.*, the shotgun that Defendants found in Mr. Crutcher's residence). Taken together, these factors created a reasonable and articulable suspicion to support the arrest of Mr. Crutcher for violating the terms of his supervised release by knowingly residing in a home with a firearm. Thus, the Court need not address whether Officer Willingham had reasonable suspicion to arrest Mr. Crutcher for unlawful possession of a firearm by a felon.

Alternatively, Officer Willingham argues that even if he did not have reasonable suspicion to arrest Mr. Crutcher, he is nonetheless entitled to immunity from Plaintiff's false arrest claim. "Police officers performing discretionary functions—such as determining whether they have probable cause to arrest—enjoy qualified immunity from suit unless it would have been clear to a reasonable police officer that, given the situation she confronted, her conduct violated a constitutional right." *Pourghoraishi v. Flying J, Inc.*, 449 F.3d 751, 761 (7th Cir. 2006) (citing *Saucier v. Katz*, 533 U.S. 194, 201–02 (2001)). In assessing the merits of a qualified immunity defense, the threshold question "is whether, given the facts taken in the light most favorable to the plaintiff, there is any merit to the underlying constitutional claim." *Id.* If so, the court then examines "whether the right was clearly established at the time of the alleged injury; that is, whether a reasonable officer would have known that his actions were unconstitutional." *Id.*

As to the threshold inquiry, Mr. Crutcher's underlying constitutional claim is that Officer Willingham violated his Fourth Amendment rights by arresting him without reasonable suspicion. The Court already determined that Officer Willingham had reasonable suspicion to arrest Plaintiff, and thus Officer Willingham is entitled to qualified immunity, without the need to address the second inquiry.

For the sake of argument, even if there were a question as to whether reasonable suspicion existed, Mr. Crutcher must still establish that no reasonable officer could have concluded that Officer Willingham had reasonable suspicion to arrest him. But there are simply too many facts inculpating Mr. Crutcher (*e.g.*, the information from the tipster, Mr. Crutcher's delay in answering the door, the shotgun, etc.) to say that *no* reasonable officer would have arrested him under the circumstances. This is especially true considering that there is no established law explaining what constitutes a "residence" for purposes of interpreting firearm restrictions in a supervised-release agreement. And there is ample precedent indicating that in grey areas where probable cause (or reasonable suspicion) may be questionable, the benefit falls to the law enforcement agent. *Anderson v. Creighton*, 483 U.S. 635, 641 (1987) ("It is inevitable that law enforcement officials will in some cases reasonably but mistakenly conclude that probable cause is present, and * * * in such cases those officials—like other officials who act in ways they reasonably believe to be lawful—should not be personally liable."); *Pourghoraisi*, 449 F.3d at 761 ("'[T]he doctrine of qualified immunity leaves 'ample room for mistaken judgments' by police officers.'" (quoting *Payne v. Pauley*, 337 F.3d 767, 776 (7th Cir. 2003))). Thus, in the alternative, Mr. Crutcher's false arrest claim is also barred by the doctrine of qualified immunity.

Officer Willingham's motion for summary judgment on this claim is granted, and Mr. Crutcher's motion for summary judgment on this claim is denied.

## 2. Malicious Prosecution

Defendants Willingham and the City of Chicago also seek summary judgment on Plaintiff Crutcher's malicious prosecution claim. Defendants argue that Mr. Crutcher's claim is untimely because it was not filed within the one-year statute of limitations for that claim. 745 ILCS 10/8-101. The parties agree that a one-year statute of limitations applies, and they also agree that Mr. Crutcher first raised his malicious prosecution claim on November 29, 2012; the dispute is over the date of accrual. "A cause of action for malicious prosecution does not accrue until the criminal proceeding on which it is based has been terminated in the plaintiff's favor." *Ferguson v. City of Chicago*, 820 N.E.2d 455, 459 (Ill. 2004). Defendants argue that the claim accrued on April 19, 2011, when the presiding state court judge issued a finding of no probable cause on Officer Willingham's criminal complaint following a preliminary hearing. Mr. Crutcher argues that his claim accrued on February 28, 2012, when he was found not guilty on the charges brought via his subsequent grand jury indictment.

To be clear, the parties refer to two separate criminal proceedings stemming from the same arrest: (1) the charge initiated by Officer Willingham's criminal complaint, in which he charged Crutcher with being a felon in possession of a firearm (Cir. Ct. of Cook Cnty., Case No. 11111538901), and (2) the charge initiated by grand jury indictment, in which they indicted Mr. Crutcher on one count of being an armed habitual criminal and two counts of unlawful possession of a firearm by a felon (Cir. Ct. of Cook Cnty., Case No. 11-CR-690101). See 725 ILCS 5/111-1 (listing the three methods of commencing a prosecution under Illinois law: a complaint, an information, and an indictment). The former case was dismissed on April 19, 2011 pursuant to a finding of no probable cause [see 70-10], and the latter resulted in a finding of not guilty on February 28, 2012 [see 70-12].

As a preliminary matter, the Court must determine whether these two criminal prosecutions against Mr. Crutcher should be treated as separate actions (each with its own statute of limitations) or as a single action (with a single statute of limitations). And if the criminal actions are separate, the Court must determine if and when each respective action was "terminated in the plaintiff's favor," so as to trigger the limitations period(s). *Ferguson*, 820 N.E.2d at 459.

Mr. Crutcher's first criminal prosecution ended at a preliminary hearing based on the judge's no-probable-cause finding. By way of background, except when charges are brought by a grand jury indictment (where the indictment is *prima facie* evidence of probable cause, see *Freides v. Sani-Mode Mfg. Co.*, 211 N.E.2d 286, 289 (Ill. 1964)), Illinois law requires that any person charged with a crime punishable by imprisonment must receive a prompt preliminary hearing to establish probable cause. See *People v. Kent*, 295 N.E.2d 710, 711–12 (Ill. 1972). There are several potential dispositions that can arise from these preliminary hearings, including striking the charges with leave to reinstate (an "SOL"), a *nolle prosequi* where the State fails to prosecute the charge, a finding of probable cause (or *no* probable cause), etc. For malicious prosecution purposes, Illinois courts have parsed through these various dispositions to determine whether any can be construed as final dispositions "in the plaintiff's favor." Relevant here, a finding of no probable cause *does* terminate the proceeding in favor of the criminal defendant. See *Cult Awareness Network v. Church of Scientology Int'l*, 685 N.E.2d 1347, 1351–54 (Ill. 1997) ("[A] favorable termination is limited to only those legal dispositions that can give rise to an inference of lack of probable cause.").

Mr. Crutcher refutes the notion that the no-probable-cause finding in his first prosecution was a final determination. He cites to *People v. Kent*, where the Illinois Supreme Court held that

the plain language of the constitutional provision that requires a preliminary hearing for all non-indictment-initiated prosecutions "negates any thought that its purpose was to attach finality to a finding of no probable cause." *Kent*, 295 N.E.2d at 163–64. But Mr. Crutcher takes this comment out of context. The "finality" point the court was making is that a finding of no probable cause at a preliminary hearing does not bar (or preclude) a grand jury from making its own findings regarding probable cause for the same charges. In other words, prosecutions of the same offense by criminal complaint and by grand jury indictment are not mutually exclusive. However, a no-probable-cause finding at a preliminary hearing *is* a final decision as to *that* criminal prosecution (regardless of whether a grand jury elects to investigate the same charges concurrently, or at a later time). Thus, both of Mr. Crutcher's criminal prosecutions were terminated in his favor.[6]

Further, in *Ferguson v. City of Chicago*, the Illinois Supreme Court considered whether an order at a preliminary hearing striking a case with leave to reinstate (an "SOL") was a final decision in the accused's favor, so as to trigger the limitations period for his malicious prosecution claim. *Ferguson*, 820 N.E.2d at 459. The court adopted the criminal defendant's argument, which was that "the expiration of the speedy-trial period, not [the] striking of the charges, [was] the operative event for assessing the timeliness of his malicious prosecution action." *Id.* (The "speedy-trial period" is based on an Illinois statute that says that all persons in custody within the state of Illinois "shall be tried by the court having jurisdiction within 120 days from the date he or she was taken into custody." 725 ILCS 5/103-5(a).) The court noted that when a case is stricken with leave to reinstate, "[t]he same charges continue to lie against the accused, albeit in a dormant state," and thus the speedy-trial clock continues to run. *Ferguson*, 820 N.E.2d at 459. In other words, the court used the speedy-trial rule as a litmus test for

---

[6] To be clear, the parties do not dispute that the charges brought against Mr. Crutcher via grand jury indictment were terminated in Mr. Crutcher's favor, as that action resulted in a finding of not guilty.

determining whether the prosecution had ended, and thus whether the malicious-prosecution limitations period had begun.

Here, the initial prosecution ended in a finding of no probable cause. And "[w]hen a defendant is discharged after a finding of no probable cause after a preliminary hearing * * *, the rule is that the speedy trial period does not continue to run after the dismissal, *and that a totally new period begins to run when the defendant is subsequently indicted*." *People v. Sanders*, 407 N.E.2d 951, 957 (Ill. App. Ct. 1980) (emphasis added). Thus, once Officer Willingham's criminal complaint was dismissed on a no-probable-cause finding, Mr. Crutcher's speedy trial term ceased to run (*i.e.*, it was "erased"), "and a wholly new tern commence[d] to run [when] the defendant [was] later indicted." *People v. Mitchell*, 420 N.E.2d 415, 419–20 (Ill. App. Ct. 1981) (holding that the clock for a defendant's speedy-trial rights stopped when the state's original criminal action terminated in a manner "analogous to a finding of no probable cause," and that the clock started over when a grand jury issued an indictment based on the same arrest); *People v. Decatur*, 548 N.E.2d 509, 511 (Ill. App. Ct. 1989) (same).

Combining the speedy-trial analogy for assessing statute of limitations periods for malicious prosecution claims as set forth in *Ferguson* (which is consistent with the Court's reading of the *Cult Awareness Network* and *Kent* cases) with the guidelines governing speedy-trial terms in no-probable-cause dismissals as set forth in *Sanders*, *Mitchell*, and *Decatur*, the Court concludes that the two prosecutions brought against Mr. Crutcher should be considered separately for statute of limitations purposes. Under this paradigm, the statute of limitations ran as to Mr. Crutcher's former criminal proceeding but not the latter.

The question, then, is whether Officer Willingham and the City of Chicago can be held liable on a malicious prosecution claim for Mr. Crutcher's second criminal proceeding, which

was initiated via grand jury indictment. In order to establish a claim of malicious prosecution under Illinois law, the plaintiff must show "'(1) the commencement or continuance of an original criminal or civil judicial proceeding by the defendant; (2) the termination of the proceeding in favor of the plaintiff; (3) the absence of probable cause for such proceeding; (4) the presence of malice; and (5) damages resulting to the plaintiff.'" *Johnson v. Saville*, 575 F.3d 656, 659 (7th Cir. 2009) (quoting *Swick v. Liautaud*, 662 N.E.2d 1238, 1242 (Ill. 1996)). "The absence of any one of these elements bars a plaintiff from pursuing the claim." *Swick*, 662 N.E.2d at 1242. "It follows that the existence of probable cause is a 'complete defense' to a malicious prosecution suit." *Johnson*, 575 F.3d at 659 (citing *Cervantes v. Jones*, 188 F.3d 805, 810–11 (7th Cir. 1999)).

The grand jury indictment of Mr. Crutcher is *prima facie* evidence of probable cause. See, *e.g.*, *Swearnigen-El v. Cook Cnty. Sheriff's Dept.*, 602 F.3d 852, 863 (7th Cir. 2010). Mr. Crutcher can rebut this presumption by presenting evidence "such as proof that the indictment was obtained by false or fraudulent testimony before the grand jury * * * or other improper or fraudulent means." *Freides v. Sani-Mode Mfg. Co.*, 211 N.E.2d 286, 289 (Ill. 1965); *Snodderly v. R.U.F.F. Drug Enforcement Task Force*, 239 F.3d 892, 901 (7th Cir. 2001) ("[I]n order to state a claim for malicious prosecution against the police officers under § 1983, [a plaintiff] must do more than merely claim that they arrested and detained him without probable cause; rather, he must allege that the officers committed some improper act after they arrested him without probable cause, for example, that they pressured or influenced the prosecutors to indict, made knowing misstatements to the prosecutor, testified untruthfully, or covered up exculpatory evidence." (internal citations omitted)).

Plaintiff argues that Officer Willingham's "improper act" was his drafting of a police report containing false statements regarding the facts of the arrest. But this allegedly false report related only to the initial prosecution, for which Mr. Crutcher's malicious prosecution claim is time barred. Mr. Crutcher does not provide any evidence showing that Officer Willingham (or his criminal complaint) played any role in the subsequent grand jury indictment. See *Logan v. Caterpillar, Inc.*, 246 F.3d 912, 922 (7th Cir. 2001) ("Illinois law requires that, in order to commence or continue a criminal proceeding, the defendant must have initiated the criminal proceeding or 'his participation in it must have been of so active and positive a character as to amount to advice and cooperation." (quoting *Denton v. Allstate Ins. Co.*, 504 N.E.2d 756, 760 (1987))); *Wade v. Collier*, 2015 WL 1741237, at *4 (7th Cir. Apr. 17, 2015). Further, while Officer Willingham's pre-indictment actions (*e.g.*, the allegedly false arrest carrying over to his lodging of a criminal complaint) could have been the first steps towards a malicious prosecution, "the chain of causation is broken by an indictment, absent an allegation of pressure or influence exerted by the police officers, or knowing misstatements made by the officers to the prosecutor." *Reed v. City of Chicago*, 77 F.3d 1049, 1053–54 (7th Cir. 1996). Here, even in the light most favorable to Mr. Crutcher, there is no evidence that Officer Willingham had any influence over the grand jury's decision to indict Mr. Crutcher. Accordingly, the Court grants summary judgment in favor of Officer Willingham on Plaintiff Crutcher's malicious prosecution claim.

Plaintiff Crutcher's malicious prosecution claim against the City of Chicago also fails. The theory of *respondeat superior* is not available against a municipality in a § 1983 action, and Mr. Crutcher has not referenced any custom, policy, or practice of the municipality that led to a deprivation of his constitutional rights. See *Monell v. Dep't of Social Servs. of City of New York*, 436 U.S. 658, 691 (1978). Regardless, in order to support a claim against a municipality, "the

plaintiff must begin by showing an underlying constitutional violation." *Schor v. City of Chicago*, 576 F.3d 775, 779 (7th Cir. 2009). Because the Court concludes that Mr. Crutcher has not alleged any underlying constitutional violation committed by Officer Willingham (or any other City of Chicago employee), there is no wrongful conduct that might become the basis for holding the City liable.[7]

### 3. Improper Issuance of a Parole Warrant

IDOC Defendant Hopkins also moves for summary judgment on Plaintiff Crutcher's claim that Officer Hopkins violated his constitutional rights by lodging a parole warrant knowing that the underlying arrest was unlawful. Plaintiffs' second amended complaint—which is composed of 15 numbered paragraphs, spanning three pages—does not allege any such constitutional violation, nor is there any reference whatsoever to Mr. Crutcher's parole revocation proceedings. [See 45.] Instead, Mr. Crutcher raised this claim for the first time in his opposition to summary judgment. [See 75, at 3–4.] Accordingly, Officer Hopkins' primary argument is that Mr. Crutcher's claim is improper because it was raised in response to summary judgment.

A plaintiff cannot amend his complaint in response to summary judgment. See *Whitaker v. Milwaukee Cnty., Wisc.*, 772 F.3d 802, 808 (7th Cir. 2014). While plaintiffs do have leeway to raise new legal theories not expressed in a complaint, plaintiffs cannot add new factual allegations or factual bases for claims at the summary judgment stage. *Id.* Here, Mr. Crutcher seeks to add an entirely new claim with an entirely new factual basis. Simply put, it is "too late in the day to be adding new claims." *Auston v. Schubnell*, 116 F.3d 251, 255 (7th Cir. 1997).

---

[7] Mr. Crutcher raised his malicious prosecution claim against the City of Chicago for the first time in his opposition to summary judgment, [75, at 4], whereas previously he only made this claim against Officer Willingham [45, ¶ 12]. A plaintiff cannot amend his complaint in response to summary judgment. See *Whitaker v. Milwaukee Cnty., Wisc.*, 772 F.3d 802, 808 (7th Cir. 2014). Thus, in the alternative, Mr. Crutcher's attempt to add a malicious prosecution claim against the City of Chicago is improper.

However, even if the Court were to allow Mr. Crutcher leave to amend his complaint a third time to add this claim (and its accompanying factual basis), Officer Hopkins would nonetheless be entitled to summary judgment. As explained in detail above, Officer Willingham had reasonable suspicion to arrest Mr. Crutcher for violating the terms of his parole (which forbade him from residing in a home with a firearm) based on the fact that Mr. Crutcher was residing in a home with a shotgun. For these same reasons, Officer Hopkins was justified in filing a parole violation report against Mr. Crutcher. In addition, Officer Hopkins drafted the parole violation *after* Officer Willingham arrested Mr. Crutcher, and the arrest itself served as a viable, independent basis for filing a parole violation report.

## B.     Claims by Plaintiff Colbert

In the second amended complaint, Plaintiff Colbert alleges (1) a false arrest claim against all individual defendants, (2) a claim that § 8-20-040 of the Municipal Code of the City of Chicago is unconstitutional, and (3) a claim that individual defendants searched his residence in an unreasonable manner, causing damage. By comparison, in Plaintiffs' opposition to summary judgment, Plaintiff Colbert conflates his first and second allegations into a single claim, alleging (1) false arrest against the City of Chicago only,[8] based on its promulgation and enforcement of a purportedly unconstitutional statute. In addition, Mr. Colbert maintains his (2) unreasonable search claim against all individual defendants, and raises two entirely new claims: (3) an unreasonable force claim against Defendant Hopkins and (4) a challenge to Officer Hopkins' entry into his bedroom as an unconstitutional warrantless search.

---

[8] Plaintiff Colbert concedes that the three Parole Officer Defendants (Messrs. Tweedle, Johnson, and Hopkins) did not arrest him, and that he is not pursuing this claim against those individuals. [75, at 3.] But he also claims that the arresting officer, Officer Willingham, "is likely entitled to qualified immunity," [*id.*], and thus Mr. Colbert is pursuing his false arrest claim against the City of Chicago only.

## 1.     False Arrest Predicated on an Unconstitutional Statute

Plaintiff Crutcher alleges that he was arrested pursuant to a now-repealed gun ordinance passed by the City of Chicago, and he is suing the City for their promulgation and enforcement of a purportedly unconstitutional law.[9] The City of Chicago says that § 8-20-140 of the Chicago Municipal Code was and is constitutional, and thus Mr. Colbert did not suffer a constitutional harm caused by a City policy. Both parties have moved for summary judgment on this issue. To be clear, this is the only claim on which Plaintiff Colbert has moved for summary judgment.

A municipality such as the City of Chicago "cannot be held liable under § 1983 unless the constitutional violation was caused by an unconstitutional policy or custom of the corporation itself. *Respondeat superior* liability does not apply to private corporations under § 1983." *Shields v. Ill. Dep't of Corr.*, 746 F.3d 782, 789 (7th Cir. 2014) (citing *Iskander v. Vill. of Forest Park*, 690 F.2d 126, 128 (7th Cir. 1982)). A municipality can be liable for adopting and enforcing an unconstitutional ordinance, see *Monell*, 436 U.S. at 690, and is not eligible for qualified immunity. *Owen v. City of Independence, Mo.*, 445 U.S. 622, 657 (1980).

The first step is to identify the ordinance in question. An officer can justify an arrest by establishing probable cause to believe that the arrestee has committed *any* crime, even when the person is ultimately arrested on additional or different charges. *Swanigan v. Trotter*, 645 F. Supp.

---

[9] Mr. Colbert is not suing Officer Willingham for his false arrest, conceding that Officer Willingham is likely entitled to qualified immunity on this claim (based on Plaintiff's presumed concession that Officer Willingham had probable cause to arrest him). The Court agrees. Even if the ordinance in question had been deemed unconstitutional, it was presumptively valid at the time of Mr. Colbert's arrest, and "police action based on a presumptively valid law [is] subject to a valid defense of good faith." *Michigan v. DeFillippo*, 443 U.S. 31, 36–38 (1979) (holding that "[p]olice are charged to enforce laws until and unless they are declared unconstitutional * * * with the possible exception of a law so grossly and flagrantly unconstitutional that any person of reasonable prudence would be bound to see its flaws," and that "an arrest made in good-faith reliance on an ordinance, which at the time had not been declared unconstitutional, is valid regardless of a subsequent judicial determination of its unconstitutionality") (citing *Pierson v. Ray*, 386 U.S. 547, 555 (1967)); see also *Thayer v. Chiczewski*, 705 F.3d 237, 247 (7th Cir. 2012) ("[A]n arrest made in good-faith reliance on an ordinance is valid regardless of a subsequent judicial determination of its unconstitutionality.").

2d 656, 674 (7th Cir. 2009); *Devenpeck*, 543 U.S. at 152. Mr. Colbert was charged with violating § 8-20-040 of Chicago's Municipal Code, which said that a firearm owner could only keep one assembled and operable firearm in his or her home. [See 70-9.] Officer Willingham claims that his selection of § 8-20-040 on the charge sheet was a "scrivener's error,"[10] and that he arrested (and intended to charge) Mr. Colbert for violating § 8-20-140 of Chicago's Municipal Code, which, as of March 31, 2011, made it "unlawful for any person to carry or possess a firearm without a firearm registration certificate." CHI. MUN. CODE § 8-20-140(a). It is undisputed that Defendants found a shotgun in Mr. Colbert's bedroom, that shotgun was not registered with the City of Chicago, and that Mr. Colbert admitted ownership of the shotgun. Thus, Officer Willingham had probable cause to arrest Mr. Colbert for violating § 8-20-140.

Having identified the relevant City ordinance, the Court next assesses the constitutionality of that provision. Mr. Colbert argues that the ordinance is unconstitutional based on the fact that the City of Chicago repealed its firearm registration laws in 2013 in response to the Seventh Circuit's decision in *Moore v. Madigan*, 702 F.3d 933, 942 (7th Cir. 2012). But *Moore v. Madigan* dealt with the constitutionality of Chicago ordinances governing "the carrying of guns in public," and had nothing to do with Chicago's firearm registration laws. Mr. Colbert

---

[10] Defendants first identified this error in their motion to dismiss, filed in July 2013, stating that "[d]ue to a scrivener's error, the charge as described in the complaint for an unregistered firearm, which is found under 8-20-140, does not match the numbered charge[] on the complaint, 8-20-040, to which Plaintiff refers to as the basis for his *Monell* claim." [20, at 5 n.2.] Plaintiffs did not raise this "scrivener's error" with Officer Willingham at his deposition, in July 2014, and as part of Defendants' summary judgment briefing, Officer Willingham supplemented his testimony with an affidavit clarifying that he arrested Mr. Colbert for failing to register his firearm pursuant to § 8-20-140 of Chicago's Municipal Code. [94-1, at 1.] See *Shepherd v. Slater Steels Corp.*, 168 F.3d 998, 1007 (7th Cir. 1999) ("[W]here the deposition testimony is ambiguous or incomplete, * * * the witness may legitimately clarify or expand upon that testimony by way of an affidavit."). Mr. Colbert argues that the Court should disregard Officer Willingham's affidavit because it contradicts his deposition testimony. *Buckner v. Sam's Club, Inc.*, 75 F.3d 290, 292 (7th Cir. 1996) ("[T]he law of this circuit does not permit a party to create an issue of fact by submitting an affidavit whose conclusions contradict prior deposition or other sworn testimony."). But Mr. Colbert does not cite to any such contradictory testimony, and upon review, Officer Willingham is quite clear in his deposition testimony that he arrested Mr. Colbert based on Mr. Colbert's "failure to register" his shotgun. [67-2, at 49–50.]

does not provide any other support for his contention that any court has deemed § 8-20-140(a) unconstitutional, nor does he make any independent arguments regarding the constitutionality of this provision. True, Chicago's firearm laws have been a subject of debate in recent years—see *McDonald v. City of Chicago*, 561 U.S. 742 (2010)—but this does not give Mr. Colbert carte blanche to argue that all of Chicago's firearms laws are unconstitutional. Because Mr. Colbert failed to show that he suffered a constitutional harm based on a City policy, his *Monell* claim cannot survive. Thus, the Court grants the City of Chicago's motion for summary judgment on this issue, and denies Mr. Colbert's motion.

### 2.    Unreasonable Search Resulting in Property Damage

Plaintiff Colbert alleges that all individual defendants searched his residence in an unreasonable manner, causing damage to his property. See *United States v. Ramirez*, 523 U.S. 65, 71 (1998) ("Excessive or unnecessary destruction of property in the course of a search may violate the Fourth Amendment * * *."). Defendants move for summary judgment on this issue arguing that Mr. Colbert has failed (1) to prove the condition of the property prior to the search, and (2) to establish that Defendants played any role in the alleged property damage.

### a.    Pre-Search Property Condition

In *Heft v. Moore*, the Seventh Circuit affirmed a grant of summary judgment in favor of the police who allegedly left the plaintiff's house "in a state of devastation" after a raid. *Heft v. Moore*, 351 F.3d 278, 282 (2003). The court based its decision on the fact that the plaintiff failed to provide "evidence regarding the pre-search condition of her home or any specific evidence that any property item was damaged," such that there was no actual evidence that the police harmed her property, or that the police harmed her property unreasonably. *Id.*; see also *McCadd v. Murphy*, 763 F. Supp. 2d 1018, 1026 (N.D. Ill. 2010) (distinguishing plaintiff's facts from

those in *Heft* in that plaintiff testified as to the pre-search condition of his home and that he personally witnessed officers breaking doors within his home).

Unlike the plaintiff in *Heft*, Mr. Colbert alleges specific facts describing how the police damaged specific items within his home, including that "[t]he officers pulled out insulation, put holes in the walls, ripped the couch open to search its contents, and tracked dog feces throughout the house." [74, ¶ 13.] Officer Willingham admits these allegations [see 91, at 4], and the IDOC Defendants deny them [87, at 4]. Mr. Colbert also testified that the officers broke his countertop and broke hinges off shelves in his kitchen. [67, at 6.] Viewed in the light most favorable to Mr. Colbert, there is a disputed issue of fact as to whether Mr. Colbert's property was unreasonably damaged during the search.

### b.     Individual Defendants' Role in the Property Damage

Defendants note that at least 10 different officers searched Mr. Colbert's home, and they argue that Mr. Colbert—who was handcuffed during most of the search and thus unable to see what the officers were doing—has failed to provide any evidence linking the four named Defendants to any of the alleged property damage. See *Minix v. Canarecci*, 597 F.3d 824, 833 (7th Cir. 2010) ("[I]ndividual liability under § 1983 requires 'personal involvement in the alleged constitutional deprivation.'" (quoting *Palmer v. Marion County*, 327 F.3d 588, 594 (7th Cir. 2003))).

Instances where multiple officers are involved in a search that results in property damage are not unusual. Because plaintiffs are often not present during the property search, or because it is logistically difficult to follow a swarm of officers conducting an expedited search throughout a residence, linking specific officers to the alleged damage has been the Achilles' heel for many plaintiffs. The Seventh Circuit has noted that "circumstantial evidence can be compelling, [but]

like any other evidence it depends on its strength." *Molina ex rel. Molina v. Cooper*, 325 F.3d 963, 974 (7th Cir. 2003). For example, the court said that where the defendant officers deny any role in the property damage, evidence of "a conspiracy of silence among the officers" might strengthen a claim. *Id.* That being said, the Seventh Circuit nonetheless has affirmed summary judgment for an officer who was one of 17 involved in the search of a vehicle that was damaged during the search, despite the fact that the plaintiffs asserted that the defendant officer was the likely culprit. *Id.* Similarly, the Seventh Circuit affirmed summary judgment for 14 officers where the plaintiff could not identify which officer(s) stole items from their home. *Hessel v. O'Hearn*, 977 F.2d 299, 305 (7th Cir. 1992) ("[T]he principle of collective punishment * * * is not—not generally, anyway—a part of our law.").

Here, Mr. Colbert sued four out of 10 or more officers (some parole officers, some police officers) who searched his home. Each Defendant denied causing any damage to Mr. Colbert's home. Mr. Colbert has not provided any evidence linking any individual Defendant to any of the damage in question, and he admits that he "is unable to provide any description of any of the officers who allegedly damaged his property." [73, at 7.] Instead, Mr. Colbert states generally that "[e]ach of the individual defendants was involved in the search," and that "[t]he question of which officers are responsible for trashing Colbert's home should be left to the jury." [75, at 15.] But Mr. Colbert "must be able to link any damage from a police search to the individual officers claimed to have caused." *Weeks v. City of Chicago*, 2014 WL 3865852, at *8 (N.D. Ill. Aug. 6, 2014) (denying summary judgment as to certain officers where plaintiff provided testimony about the skin color of the offending officers, thus providing some evidentiary basis for a jury finding in his favor). While we may assume that the property damage was caused by one or more of the 10 or more officers who searched Mr. Colbert's home, "[t]hat is not good enough to fend

off summary judgment." *Hessel*, 977 F.2d at 305. Accordingly, the Court grants Defendants' motions for summary judgment on this claim.

### 3.      Unreasonable Force

Plaintiff Colbert's unreasonable force claim does not appear in Plaintiffs' second amended complaint. The factual basis for this claim—*i.e.*, that while Mr. Colbert was in handcuffs, Officer Hopkins wrestled him to the ground and took his keys [see 75, at 2]—also goes unmentioned in Plaintiffs' complaint. Mr. Colbert cannot amend his complaint at the summary judgment stage to add, for the first time, an entirely new legal claim with an entirely new factual basis. See *Whitaker*, 772 F.3d at 808.

### 4.      Unreasonable Search of Plaintiff Colbert's Bedroom

Plaintiff Colbert's unreasonable search claim does not appear in Plaintiffs' second amended complaint. The complaint does contain an allegation that Defendants "searched the residence of plaintiff Colbert in an unreasonable manner," but that allegation relates to Plaintiff's property damage claim, not a warrantless search claim. [See 75, ¶ 6.] Plaintiffs' complaint lacks any reference to the allegedly unlawful search of Mr. Colbert's bedroom. Again, Mr. Colbert cannot amend his complaint at the summary judgment stage to add, for the first time, an entirely new legal claim with an entirely new factual basis. See *Whitaker*, 772 F.3d at 808.

## IV.      Conclusion

For the foregoing reasons, Defendants' motions for summary judgment [65, 71] are granted, and Plaintiffs' motion for partial summary judgment [77] is denied.


Dated: May 26, 2015

_____
Robert M. Dow, Jr.
United States District Judge